The TRANSPORT INSURANCE COMPANY, Appellant,

v.

Jimmie Q. CAMPBELL, Appellee.

No. 17292.

Court of Civil Appeals of Texas, Houston (1st Dist.).

April 12, 1979.

Rehearing Denied May 17, 1979.

Talbert, Giessel & Stone, Alice Giessel, Houston, for appellant.

Thurlow & Hennessy, Edward J. Hennessy, Houston, for appellee.

Before COLEMAN, C. J., and PEDEN and DOYLE, JJ.

COLEMAN, Chief Justice.

This is an appeal from a judgment entered on a jury verdict awarding Jimmie Q. Campbell total and permanent disability benefits under the Workers' Compensation Act. The Transport Insurance Company contends that there is no evidence that a blow to the back of Campbell's head sustained in the course of his employment was the producing cause of the total incapacity subsequently sustained by Campbell due to a stroke (hemiplegia).

Mr. Campbell was a long haul truck driver employed by J. H. Rose Truck Line. On October 12, 1973 he drove into the Rose Truck terminal located in Montebello, California. While he was attempting to attach a trailer to the tractor which he was driving, it was found that the mud flap brackets attached to his tractor would have to be removed.

Mr. Campbell was directed to remove the brackets and while in a squatting position using a wrench to remove a nut holding the bracket, the wrench slipped causing him to fall back and bang the back of his head against the trailer dolly. He suffered a painful blow which caused a bump to rise on his head, but the force of the blow did not break the skin. He did not lose consciousness. He reported the incident and continued to remove the mud flaps. At about two o'clock on the morning of October 12, he left the Montebello terminal.

Mr. Campbell testified that he then drove to Rialto, California, a distance of some 50 miles where he drove into a truck stop for fuel. It was just before daylight when he arrived in Rialto. At that time he was having no physical difficulty, but because he was tired he decided to rest. He secured a room at the truck stop and went to bed.

About ten o'clock in the morning he woke up, took a shower and shaved. At that time he had a slight headache which had persisted since he had bumped his head. However, he was not sure that he had the headache while he drove from Montebello. He stated that he didn't pay "all that much attention" to it.

After he finished cleaning up he took two aspirin for the headache and then cleaned his truck and fueled up. He went into the restaurant and ordered breakfast. While he was eating his breakfast he noticed he was losing control of his hand. He remembered that he had dropped a bundle of clothing when he went from his room to the truck. While he was paying his bill his leg gave way and he fell to the floor. He got up and went across the driveway to a pay phone and called his mother to tell her that he was going paralyzed on his left side. He then walked to the door of the truck stop and fell again and was unable to get up. An ambulance took him to the San Bernardino Community Hospital. At that time Mr. Campbell was suffering from soft paralysis of his left side.

Mr. Campbell had undergone a physical examination on May 5, 1973, when he went to work for J. H. Rose. This was an examination required by the Interstate Commerce Commission. It was performed by a doctor selected by J. H. Rose, and after the results of the physical were known he was employed.

Mr. Campbell testified that at one time he had Bell's Palsy, which went away in about three or four weeks. He testified that he had never been treated for hypertension or high blood pressure and had never taken medication for those problems. He had never been treated for a heart attack.

When Mr. Campbell arrived at the emergency room of the hospital he was first seen by the doctor on duty, who instituted emergency procedures including a spinal tap. This doctor called in Doctor Lutz, an internist, who continued to treat Mr. Campbell while he was in the San Bernardino Hospital. Doctor Lutz called in Doctor Prahar, a neurosurgeon, for consultation. During his stay in the hospital Mr. Campbell was examined by Doctor Cover, a specialist in internal medicine, who was employed by Transport Insurance Company. Doctor Cover examined Mr. Campbell on October 23, 1973. Thereafter Mr. Campbell was transferred to the Veterans Administration Hospital and was not seen again by these doctors.

■ Where the circumstances shown by the evidence are such that it is reasonable to believe that a job-related incident precipitates a physical failure, a jury finding that the incident was a producing cause of the plaintiff's disability is supported by evidence. In determining the question of reasonableness, consideration must be given to the time interval between the incident and physical failure and whether the occurrence is competent to produce such a result. *Baird v. Texas Employers' Insurance Association*, 495 S.W.2d 207 (Tex.1973); *Insurance Company of North America v. Kneten*, 440 S.W.2d 52 (Tex.1969). The Supreme court of Texas has been liberal in construing the word "accidental" and "injury" in cases involving heart attacks and strokes, and in reaching the conclusion that the record at hand presented some evidence of a particular strain, overexertion or shock which caused the incapacity. *Baird v. Texas Employers' Insurance Association*, 495 S.W.2d 207 (Tex.1973). Where the disability results from certain other conditions, such as cancer, where causation is less well understood, the plaintiff has the burden to prove by a competent medical witness that in reasonable medical probability the alleged event or accident caused the injury. However, it is not critical, as matter of semantics, that the doctor use the particular words "in reasonable medical probability" if that is, in context, the substance of his testimony. *Insurance Company of North America v. Kneten*, 440 S.W.2d 52 (Tex. 1969).

Doctor Lutz, the treating physician, testified that Mr. Campbell told him that he had received a bump on the head and that at the time he took a physical examination for

his job he had been told that he had high blood pressure. On examining Mr. Campbell he found a significantly elevated blood pressure, distorted speech, a harsh heart murmur and paralysis of the left side. He testified that based on medical probability Mr. Campbell had developed a clot in the brain or had a clot elsewhere which had traveled to the brain, and had paralyzed the left side of his body. He considered it probable that the blood clot was caused by high blood pressure. He recognized the possibility that the bump on the head could have caused the stroke but felt that it was highly unlikely, He stated that a trauma to the head would ordinarily cause medical symptoms which would become apparent immediately or else would probably cause "a very insidious development of symptoms and findings over a period of perhaps weeks or months." The fact that Mr. Campbell's symptoms developed rather dramatically and suddenly over several minutes is more compatible with a stroke syndrome, a clot or a hemorrhage. Because of the sketchy information he had at the time the testimony was given, Dr. Lutz could not be sure but was of the opinion that a blood clot, as opposed to a hemorrhage, was more likely to be the cause of Mr. Campbell's condition.

Doctor Prahar saw Mr. Campbell only one time and gave an opinion based upon his experience with head injuries and his knowledge of the causes of hemiplegia gained from the study of other cases. In terms of medical probability it was his opinion that the cause of Mr. Campbell's condition was hardening of the arteries in the blood vessels to the head. Based on reasonable medical probability he did not think that the blow to the head had anything to do with the stroke in Mr. Campbell's case. He stated that he would not discount the possibility that the hemiplegia could have been caused by a blow to the head but that in his opinion it was unrelated.

Doctor Cover, who examined Mr. Campbell at the request of Transport Insurance Company, testified that he obtained from Mr. Campbell a history of prior hypertension. He diagnosed Mr. Campbell's condition as a weak paralysis probably due to clotting in the cerebral blood vessels. He did not relate Mr. Campbell's condition to the minor blow or to any condition of his employment. He considered that the most likely cause of the paralysis in terms of medical probability to be his hypertension. He stated that he considered it significant that Mr. Campbell was not struck down by the blow and did not have any interval symptoms such as a headache or "impaired mentation." It was his opinion that in Mr. Campbell's case of all the possible causes of the stroke, the possibility of a blow contributing to that result would be about the least likely and extremely remote, although he could not entirely discount the possibility. At a later time when he had been furnished certain data from the Veterans Hospital he stated "now I recognize the possibility that there was hemorrhage and that such a hemorrhage could be the result of trauma." However, he again stated that in his opinion Mr. Campbell's paralysis was not related to the bump on his head.

As was stated in *Baird v. Texas Employers' Insurance Association*, 495 S.W.2d 207 (Tex.1973), "an answer to the problem of whether the evidence, most often circumstantial in nature, together with the inferences that may be drawn therefrom, present issues of fact, is always difficult in this type of case. There is no precise rule to measure probative force and by which to decide if questions of fact are raised by the evidence." Here we have a blow to the head sufficient in force to cause pain and swelling. No other symptoms appear for some eight hours. A short time before Campbell suffered his first disabling symptoms he had a slight headache. He was not sure he had a headache prior to that time. Within a short period of time after noticing the headache, Mr. Campbell suffered paralysis of his left side. There is medical testimony that a blow to the head might cause a hemorrhage that might result in hemiplegia. There is no evidence that the blow to the head suffered by the plaintiff in fact caused a hemorrhage. Each of the doctors testified that in reasonable medical probability the stroke was caused by hyperten-

sion. Two of the doctors testified that the plaintiff gave a history of previous hypertension. The plaintiff denied giving this information to the doctors. Doctor Lutz testified that his examination of the patient revealed that he was suffering from hypertension and that he treated him for that condition while in the hospital.

There is medical testimony which can be considered in evaluating the circumstantial evidence relied on to establish a necessary chain of causation from the blow on the head to the condition of hemiplegia. Doctor Lutz testified that hypertension is known to produce vascular disease, hardening of the arteries, and increases the risk of strokes. He testified that there are numerous causes of hypertension but that probably in ninety percent of the cases the cause is unknown. He testified that blunt trauma to the body could be the cause of a blood clot but that the most usual cause is atherosclerosis. A blow to the head could tear a blood vessel which might result in either a major or a minor hemorrhage. Blood would leak into surrounding tissue and if the tissue is strong enough it would be localized there and absorbed or altered chemically and replaced by a scar. If the tissue is not sufficiently strong to contain the blood, it would leak into other structures which might increase the pressure within the brain. The increased pressure might lead to hemiplegia. Doctor Lutz also testified that a hemorrhage resulting from head injury usually tends to develop with headache, vomiting, and dizziness before the development of a hemiplegia.

■ There is no medical testimony sufficient to support the finding of the jury that there was a causal relationship between the blow on the head and the hemiplegia. In assessing the sufficiency of the circumstantial evidence to support the jury verdict we are mindful of the general rule that to establish a fact by circumstantial evidence, the circumstances relied on must have probative force sufficient to constitute a basis of legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit a purely

speculative conclusion. The circumstances relied on must be of such a character at to be reasonably satisfactory and convincing. At all events they must not be equally consistent with the nonexistence of the ultimate fact. Where the proven circumstances are consistent with either of two theories and there is nothing to show that one rather than the other probably is correct, then neither is proven. *Baker v. Loftin*, 222 S.W. 195 (Tex.Comm.App.1920, judg. approved); *Republic National Life Insurance Company v. Bullard*, 399 S.W.2d 376 (Tex. Civ.App.-Houston, writ ref'd. n. r. e.); *Polasek v. Quinius*, 438 S.W.2d 828 (Tex.Civ. App.-Austin 1969, writ ref'd. n. r. e.)

The facts presented do not reasonably lead to a conclusion that the plaintiff's injury was caused by the blow to the head rather than that the injury was caused by hypertension. Common experience and knowledge in the area under consideration is speculative and unreliable and the medical testimony is strong and uniform to the effect that the blow to the head was not in reasonable medical probability a factor in the causation of the hemiplegia.

Since there is no evidence that the blow to the head caused or contributed to the disability of the plaintiff, the trial court erred in overruling defendant's motion for directed verdict made at the close of all the evidence. The judgment is reversed and judgment is rendered for appellant.

On Motion for Rehearing

■■ On reconsideration of the evidence we have concluded that we were in error in reversing this case. The rule of *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965) must be applied and we can consider only the evidence and inferences tending to support the jury findings, and must disregard all evidence and inferences to the contrary.

The medical witnesses agreed that the exact cause of the plaintiff's hemiplegia could not be pinpointed because sufficient testing was not performed. They agreed that a blow to the head of the plaintiff could result in that condition. They relied on a history of hypertension which the

plaintiff denied relating to them. We conclude that the medical testimony to the effect that hypertension was the probable cause of the hemiplegia must be disregarded. Furthermore, since this testimony was based on general medical experience and medical literature rather than the specific symptoms of the plaintiff, we do not consider the finding on causation to be so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

Mr. Campbell, testified that he was not having any difficulties with his health and had passed a work related physical examination a few months prior to the date on which he received a blow to his head. The blow was severe enough to raise a knot on his head and to cause a headache. The headache persisted in a mild form until the time of his collapse some eight to ten hours later. No incident intervened between the blow to the head and the on-set of the hemiplegia. No unusual exertion was experienced during this period of time. He stopped for the night a short time after the accident because he was not feeling well. When he got up the next morning he began experiencing symptoms which led to his collapse within a short period of time.

The circumstances are such to lead to the reasonable conclusion that the job related incident precipitated the hemiplegia. The testimony of the doctor is not so adverse to the existence of probable cause as to overcome the weight of the circumstantial evidence. *Insurance Company of North America v. Kneten*, 440 S.W.2d 52 (Tex.1969).

The motion for rehearing is granted and the judgment heretofore rendered by this court is withdrawn. The judgment of the trial court is affirmed.